Caldwell Wholesale Company versus RJ Reynolds Tobacco. I'd like to start with a couple of points that I think go directly to the main arguments that Reynolds is making on this appeal. The first point is that the termination of Caldwell's direct purchasing contract is not the source of injury at issue in this case. In fact, it really didn't even cause any injury because Caldwell was able to purchase the products for the same price or better than it was able to when it was a direct purchaser. The reason why is Caldwell never got the best price from Reynolds under their three-tier pricing plan. Caldwell now purchases from another wholesaler who does get the best price and therefore is paying about the same. It's reselling the RJR product that is Caldwell's problem now, not because of the lack of a direct purchasing contract or any contract, but instead because of the decision and subsequent continuous conduct of RJR in not paying buy-downs to retailers for purchases they make from Caldwell when it will pay that retailer the lucrative buy-down payments for product purchase from Caldwell's competitors. It went on for years. What happened during those years when you didn't file suit? Was it not causing you to lose money? Yes. Yes it wasn't or yes it was? It was, but two things on that. It immediately began to cause us to lose sales, lose customers, lose business, lose money. Caldwell has been shrinking for 14 years. The reason it didn't file suit originally is a couple. One, the reason that this happened to Caldwell is because it was a party along with 20 or so other wholesalers in a piece of litigation back in 2003 and 2004. Everyone knows in this industry, if you sue Reynolds or you sue Philip Morris, you better be ready to take their best shot because it happens over and over again. It's sort of a Corvorkian strategy, if you will, to sue one of those parties. The wholesalers and retailers in this industry do not take that lightly and they put it off, put it off, put it off until they reach the point where they say, all right, I am going out of business if I don't do this. That point came in this case mostly as a result of the aftermath of the most recent acquisition of Reynolds, which involved the company that makes Doral, which was the second biggest selling brand for Caldwell. It's one of the biggest selling brands in America in general. Once Doral got within this system of buy-downs not being honored, that was pretty much the final blow to Caldwell, where it was either sue and fight for your life or live out the remainder of your very short life and then be gone. That is the situation they find themselves in now, which is why they decided to finally sue. On the timeliness issue, of course, we've got the issue of continuous tort in this case. If I could, however, I'd like to briefly mention the other main argument of RJR First, and that is that we're talking about a refusal to deal here. We're not talking about a refusal to deal. We're talking about coercing a third party into not dealing with Caldwell. Under the jurisprudence, that conduct receives a lot less protection than a mere refusal to deal. Caldwell doesn't need any contract with RJR. They just need for RJR to not create an exception in its contracts with retailers, an exception that says, hey, retailer, we'll pay you these lucrative buy-downs for every carton of our product that you buy and sell in your store, unless you buy it from Caldwell. That, which has nothing to do with a contract with Caldwell, is what is happening here. We're not trying to argue with RJR's contention they don't have to enter contracts with Caldwell. However, if they are trying to coerce a third party to not deal with Caldwell, then there are certain standards they have to meet. One is that their actions are taken in furtherance of their legitimate interests or to protect their legitimate interests, rather than simply to vindictively inflict injury on another party for some perceived past actions that they didn't like. And so the refusal to deal cases are not germane here. On the continuous tort issue, again, the operating cause of the injury happens every day when a transaction for cigarettes takes place, where a customer of Caldwell who buys all their other products from Caldwell is forced to buy their RJR products from someone else because of this manipulation of the buy-down program to inflict injury on Caldwell. And every two weeks, buy-down payments are paid to retailers. And these retailers cannot do without these payments. They represent a substantial portion of the profits that they make. In fact, they can't really be profitable on RJR products if they pay the going price for them and don't get the buy-down rebate. And this is why they cannot buy those products from Caldwell under these current circumstances. Now, this is something, again, it's a very complicated buy-down mechanism program that is administered on a weekly basis by RJR, payments every two weeks, transactions occurring daily where RJR has to make a decision of whether or not they're going to pay that retailer a buy-down. So it's not something that was just done once 14 years ago and the effects of it are still being felt. The effects are only still being felt because every day, transaction after transaction, it's done again. And that is the basis for our contention that is continuing toward. And we think we've clearly alleged that that is what is going on in our complaint. Also like to mention this idea that Reynolds brings up that what we're asking for is a sub-jobber agreement, whatever that is. A sub-jobber, by definition, is someone that doesn't have a direct purchasing agreement with the manufacturer. They're buying, and that's what Reynolds is now. I mean, that's what Caldwell is now, relegated to sub-jobber status with respect to RJR products. They still direct with Philip Morris and the other majors. But so there is no agreement. There's no sub-jobber agreement that's required. Caldwell reports its data to Management Sciences that collects it all. You said you've been relegated to sub-jobber status. Is that what you're saying? That's with respect to RJR because they're no longer a direct purchaser. But again— When did that happen? That happened when their direct purchasing contract was terminated in 2004. But again, that's not their problem that they're a sub-jobber because they're still getting the product for the same thing they used to have to pay RJR for. The problem is that in reselling it, there's plenty of sub-jobbers that are part of the buy-down process. The fact they don't directly purchase— Your problem didn't start in 2004. No, because around the same time, and presumably for the same vindictive reasons, RJR separately went to their retailers and said, look, under our contracts with you retailers, if you buy from Caldwell, we're not going to pay you the buy-down rebate. When did that happen? Around the same time, for the same vindictive reasons. But that's not the start of your problem. Yes, that was. That was the start of the problems, yes. And again, as I said, those problems got progressively worse as RJR acquired more and more companies in this sector, whether it be chewing tobacco or cigarettes, where they brought those acquired companies' products into the fold of this exception they created in their retail contracts that punishes Caldwell and doesn't honor its invoices for buy-down purposes and drives those retailers away from Caldwell's business. On the merits of the Loepp Acclaim, Reynolds defends its actions, but the standard is that if you're taking an action with the specific purpose of harming someone, of inflicting injury, then you need to have a legitimate business purpose for doing so. Now, people inflict injury every day. Competitors fight and injure each other every day. Take market share, take customers. That's not what we're talking about. These two aren't direct competitors. Not only is there no advancement of Reynolds' legitimate business purposes by denying Caldwell's participation in this buy-down program, they're actually limiting their own distribution. They're willing to limit their own sales in order to punish Caldwell for something that they perceived Caldwell shouldn't have done 14 years ago. So given that that is their motive, and they have certainly not offered any other motive, and that appears to be their motive, and they're not advancing their legitimate interests, that is a Loepp violation. You're not alleging that the buy-down program is itself unlawful, right? Certainly not if administered on a non-discriminatory basis. You just think Caldwell should be allowed to participate in the program? Yeah, to technically state it, because Caldwell doesn't really participate. It's the retailer participating, but you know what I'm saying. And that's kind of an important distinction because of this issue of Reynolds arguing that there's got to be some agreement with Caldwell in order for Caldwell's invoices to be honored, and there doesn't have to be. When was the last time you asked to participate in this third-party way? You know, I only know of two instances. Every few years it happened. I don't know what kind of communications are taking place between my client's employees and the representatives with RJR that they may deal with. Maybe I should ask it this way. Can you point to a citation in the record where you're asked to do it within the limitations period? Well, what the limitations period is, it depends on the application of continuous tort doctrine, but no, the last time that... From the date of the suit back... The last time the client had me formally write a letter and there were meetings and discussions was probably not within a year. I don't know the exact date, but it was not within a year of filing a suit. On the other cause of action, the issues are very similar on tortious interference, and that is that you've got a right to influence third parties to not deal with the plaintiff, but you don't have a right to do it for illegitimate reasons. You only have a right to do it to pursue your legitimate competitive interest. It frequently happens between two competitors, i.e., I'm trying to talk your customer into buying from me. Here they're not even competitors, but the activity is still taking place and it's not for any legitimate competitive interest, and so I believe... Why is that an illegitimate reason? Pardon? Why is that an illegitimate reason and not a business decision? Just because there's no legitimate business interest being advanced. In fact, they're constricting their sales, and there appears to be, and they've had many years to say what their motive is and have declined to do so, but it appears to simply be punishment of Caldwell that not only doesn't advance legitimate business interest, but actually retards them because that's one less distributor who has a lot of tentacles in that market, had been distributing RJR's products and buying them directly for 50 years before this dispute arose. The last thing I would say is if the court finds that the continuous tort doctrine does not apply, this is not a continuous pattern of conduct, but rather is isolated incidents of Caldwell having their participation in the buy-down program excluded one sale after another after another, and I think that's what the district court found when it made that comment about these being separate acts. Well, if that's the case, then each of those acts should have a one-year prescriptive period, and the acts that occurred within one year before the suit was filed should be allowed to go forward in this case and not be prescribed. But what's the act you're talking about? The act, well, there's several acts, and they all involve the administration of this buy-down process, system, program. They are, if Caldwell gets a new customer and they reach out to RJR, RJR tells them, I will not, if you buy your RJR bought-down products from that wholesaler, I will not. They're not changing anything when they say that. They've been doing that for years. Well, not on each transaction. They just, they keep doing it again on each transaction. But yes, they have refused to, they've refused to honor the invoices. They've not made any exception on that policy in years. Isn't that right? I mean, they're doing the same thing. I don't know that it's, I don't know that I would even call it a policy. It's a decision they have to make each time. Here's the other thing. And they make it every time consistently. If you purchase from Caldwell, we don't participate in the buy-down, making the buy-down payments. That's consistent, isn't it? I would say continuously. I know you're saying it's a new act. It's a new act to buy you. They've never changed on that. They have, they have continued to do it. But, but it's not a, it's, it's a decision they've got to make each time a retailer wants to buy from, from Caldwell. And here's the other side. It's not like they made one decision and they're sticking to it. Okay, here's the other side of that coin. The other actions they're taking that are the source of injury is, in fact, paying a to a similarly situated competitor of Caldwell's on a sale that would have been Caldwell's sale if Reynolds was not paying the lucrative buy-down to that retailer, to coerce that retailer into instead purchasing that product from someone else. So, so there's actions being taken in this every day. It's not the, I dug a canal 25 years ago, like the, like the one case discussed in the briefs, and I haven't done anything since then. But you've, you're still suffering damage from that canal I dug. This is an instance, because it's business transactions, one after another, it's one new customer after another that wants to purchase from Caldwell. And so we do think it's a little different, Your Honor, than the cases that, that do involve one decision, the effects of which, without further action, just continue out on into time. I'd like to reserve the balance of my time for you both. All right. Thank you, Counsel. Good afternoon, Your Honors. I'm Shai Voresky with Jones Day, representing the Appleby R.J. Reynolds. I'd like to talk about what the cause of the alleged injury was, when it occurred, and why it's not actionable. The cause of the alleged injury was RJR's decision not to have a relationship, whether as a direct wholesaler or as an indirect wholesaler, with Caldwell. That decision was initially made in 2004, and according to the complaint, it was reaffirmed in 2011, and again in 2014. Any harm to Caldwell that resulted from that decision is just a consequence that follows from those earlier decisions. They're not independent, unlawful acts. In that respect, this case is just like the ConAgra versus Miller case that we discuss in the briefs. Miller's alleged injury followed from ConAgra's decision to terminate the relationship with Miller. Miller could have, could have, you can always recharacterize that kind of a decision as a continuing decision not to reestablish the relationship that you previously decided to terminate. But the court in that situation rejected the continuing violation doctrine on those facts. Otherwise, any sort of tort or breach of contract claim could always simply be recharacterized as a continuing violation because the defendant hasn't remedied the alleged breach or the alleged tort. So the cause of the injury here was the decision not to have a relationship with Caldwell, and that occurred, no matter which point in time you look at in the complaint, well outside of the limitations period. The, neither the LUTPA claim nor the tortious interference claim are actionable on the merits either. With respect to the LUTPA claim, Louisiana unfair competition law allows a business the absolute right to deal or refuse to deal with whomever it wants. And that's what's going on here. Caldwell argues that, in fact, this isn't about refusing to deal with Caldwell. It's about the relationship with the retailers. That misunderstands what's going on here and is not even an accurate characterization of Caldwell's own complaint. If you look at paragraphs 22 and 23 of the complaint, they talk about RJR's refusal to honor Caldwell's invoices. And if you look at pages 20, at paragraphs 27 and 31, they talk about RJR's refusal to put Caldwell on the data reporting program. So yes, the buy-down payments are ultimately made to the retailers, but they reflect the relationship that Reynolds has with its wholesalers. Whether it chooses to accept data from a particular wholesaler and issue buy-down payments on that basis. And so... But if you do that, does that work to your disadvantage like Mr. Keegan said? I don't see why it would work to our disadvantage. There is, of course, a retailer involved here as a third party. But ultimately, it is particular wholesalers who are either allowed to participate or not allowed to participate in the program. And that's a relationship that Reynolds chooses either to have or not have with particular wholesalers. And it's not just Caldwell that isn't a part of this program either. There are wholesalers that Reynolds chooses to have a relationship with and wholesalers, including but not limited to Caldwell, that it doesn't. The point is that Louisiana law allows a business that absolute right to deal or not deal with whomever it wants. And Caldwell would gut that principle as a matter of both substantive and statute of limitations law. It would open the door to essentially boundless judicial scrutiny of business decisions to deal or not deal that are made every day. Both this court and the Louisiana courts have rejected that kind of an expansive understanding of both LUTBA and tortious interference theories and instead have taken a very narrow view of both the scope of these types of claims and the time in which they can be brought. So the LUTBA claim fails on both for limitations reasons. It fails on the merits because of the absolute right to deal or not deal. It also fails for lack of standing under this court's Tubos decision, which holds that as a matter of Louisiana law, only competitors and direct consumers can bring a LUTBA claim and Caldwell is neither. The only argument made for why this court should ignore that binding precedent is based on a plurality opinion of the Louisiana Supreme Court, and that's not sufficient under this court's approach to Erie for the panel to disregard prior precedent. With respect to the tortious interference claim, Caldwell concedes that the continuing violation analysis is the same whether we're talking about LUTBA or whether we're talking about the tortious interference tort, and so that claim is untimely for all of the same reasons. It also fails on the merits. This is a highly disfavored tort. There is not a single reported decision that either side has been able to find or cite in its briefs upholding liability under Louisiana law for tortious interference. In the reply brief, Caldwell points to one decision in which there was such a claim asserted in the trial court. On appeal, however, the court didn't address that claim and the judgment was supported based on claims other than tortious interference. So this is a highly disfavored claim, and for good reason. Every time a business like Reynolds makes a decision consistent with its right to deal or not deal with whomever it wants, of course that's going to have an impact on the party that either is included or is not included in the buy-down program. Louisiana law doesn't convert every decision like that into a tortious interference claim, and the Eustica case that we cite in the briefs is instructive on that. There, a radio station was free to choose who was going to be mentioned on its airwaves or not, and by deciding that a particular ticket promoter couldn't be mentioned on its airwaves, that had an effect, and it had a predictable effect, on that promoter's relationship with its customer. That's not the kind of interference that rises to the level of a tortious interference claim. If it were, again, everyday business decisions would be subject to judicial review and under Caldwell's theory with no limitations period applicable to that. That's not Louisiana law. If the Court has no further questions, we ask that the district court's judgment be affirmed. Thank you, Counsel. Rebuttal. Very briefly, Your Honors. With respect to the cases Counsel just discussed, we addressed them all and what the distinctions are in the brief. I don't think it would be worthwhile for me to reiterate that here. It wasn't only Miller v. Conagra, but a couple of other cases on the continuing tort doctrine that were cited by Reynolds that are completely distinguishable in the facts, and we'd rely on the brief for those. On the standing issue, yes, Sheremy was a plurality opinion. If that is all that had happened, we would not be urging that point as forcefully, but what has happened since then is the federal district courts in Louisiana and the courts of appeal, not every single one of them, but I don't know of any that went the other way, but the wave of decisions post-Sheremy has been to treat it like a majority opinion, to adopt its reasoning, and to expand standing beyond consumers and competitors to include other parties. So I think if the Court under Erie were to go back and look at the Louisiana intermediate courts as well as the district court's treatment of that issue, they would conclude that Louisiana law now is that standing is extended beyond just consumers and competitors. The BIM case, which we rely on for tortious interference with business relations, I think if you go back and look at that case, regardless of technically whether or not they needed to go as far as to discuss which cause of action they were talking about, because there were issues, there were threads through more than one, the BIM case is undoubtedly an endorsement for the proposition that that is a viable cause of action, and we've distinguished in our brief the cases on tortious interference with business that are relied upon by rentals. The facts are different for various reasons. I don't need to repeat those here. And responding to any other questions the Court may have, I don't have anything further. Thank you. Thank you, counsel. That concludes the case.